### IN THE UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IBERIABANK Corporation,<br><br>    Plaintiff,<br><br>  v.<br><br>Illinois Union Insurance Company and Travelers Casualty and Surety Company of America,<br><br>    Defendants. | Case No.: _____<br><br>**JURY TRIAL DEMANDED** |

### COMPLAINT

Plaintiff IBERIABANK Corporation ("IBERIABANK"), for its Complaint against Defendants Illinois Union Insurance Company ("Illinois Union") and Travelers Casualty and Surety Company of America ("Travelers"), alleges as follows:

### I.   INTRODUCTION

1. IBERIABANK brings this action to recover the insurance proceeds to which it is entitled under certain Bankers' Professional Liability insurance policies (the "Policies") issued by defendants Illinois Union and Travelers (the "Insurers").  Specifically, the Insurers have failed to honor their obligations under the Policies to pay IBERIABANK's losses in connection with a $11.7 million settlement (the "Settlement") of disputed allegations relating to IBERIABANK's professional services in connection with certain mortgage loans insured by the Federal Housing Administration (the "FHA").

2. Like many lenders, IBERIABANK participated in the FHA's Direct Endorsement Lending Program (the "DE Lender Program") over the years.  Under the DE Lender Program, IBERIABANK underwrote mortgage loans directly for the FHA without prior approval from the

U.S. Department of Housing and Urban Development ("HUD"). The FHA insured those loans underwritten by IBERIABANK pursuant to the DE Lender Program upon certification that HUD's underwriting guidelines had been met.

3. Through an investigation conducted, *inter alia*, by the U.S. Department of Justice ("DOJ"), the DOJ asserted that certain IBERIABANK loans did not comply with HUD guidelines and that IBERIABANK therefore violated the False Claims Act (the "FCA") by, *inter alia*, submitting certifications to the government that were inaccurate. IBERIABANK vigorously disputed the DOJ's allegations and has incurred substantial costs defending itself.

4. The DOJ's allegations fall squarely within the Policies' broad insuring agreement for professional liability coverage by asserting Wrongful Acts in rendering Professional Services, the precise coverage purchased by IBERIABANK. Despite this, the Insurers have disclaimed coverage under the Policies they sold to IBERIABANK.

5. IBERIABANK files this action to establish that it is entitled to receive the benefit of the insurance coverage it purchased in compensation for its losses related to the Settlement.

**II. THE PARTIES**

6. Plaintiff IBERIABANK is a corporation organized under the laws of the State of Louisiana and is headquartered at 200 West Congress Street, Lafayette, Louisiana. IBERIABANK maintains substantial operations in New Orleans, Louisiana. Specifically, significant members of IBERIABANK's senior management, including its President and Chief Executive Officer, Chief Operating Officer, Chief Financial Officer, General Counsel, and other executives are located in New Orleans. The management decisions for IBERIABANK, including the discussions giving rise to the insurance claim at issue in this litigation, were conducted in IBERIABANK's New Orleans office.

7. Defendant Illinois Union is an insurer engaged in the business of selling insurance contracts to commercial entities such as Plaintiff in Louisiana and elsewhere. Upon information and belief, Illinois Union is incorporated under the laws of the State of Illinois and maintains its principal place of business in Chicago, Illinois.

8. Illinois Union sold professional liability insurance coverage to IBERIABANK by issuing Management Protection Insurance Policy No. G25568606 004 (the "Primary Policy") to IBERIABANK. In exchange for the Primary Policy, IBERIABANK paid a premium of $270,000.

9. Defendant Travelers is an insurer engaged in the business of selling insurance contracts to commercial entities such as IBERIABANK in Louisiana and elsewhere. Upon information and belief, Travelers is incorporated under the laws of the State of Connecticut and maintains its principal place of business in Hartford, Connecticut.

10. Travelers sold excess professional liability coverage to IBERIABANK by issuing Select One+ Excess Policy No. 106376730 (the "Excess Policy"). In exchange for the Excess Policy, IBERIABANK paid a premium of $100,000.

### III. JURISDICTION AND VENUE

11. The subject matter jurisdiction of this Court is based upon 28 U.S.C. § 1332, in that there is complete diversity of citizenship among the Parties, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

12. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

## IV. FACTUAL ALLEGATIONS

### A. The Insurance Policies

13. For September 30, 2015 to September 30, 2016 (the "Policy Period"), IBERIABANK purchased the Primary and Excess Policies from the Insurers for a total of $15,000,000 in insurance coverage.

14. The Primary Policy has an applicable limit of $10,000,000 and insures IBERIABANK above a $500,000 self-insured retention. The Primary Policy provides broad insurance protection to IBERIABANK against losses arising from third-party claims, including those alleging that the insured committed wrongful acts. A true and correct copy of the Primary Policy is attached to this Complaint as Exhibit A.

15. The Primary Policy contains a Bankers Professional Liability Coverage Part that includes the following insuring agreement:

> The Insurer shall pay on behalf of the Insureds Loss which the Insureds become legally obligated to pay by reason of any Claim first made by a third party client of the Company against the Insureds during the Policy Period or any applicable Discovery Period for any Wrongful Acts in rendering or failing to render Professional Services, if such Wrongful Acts take place prior to the end of the Policy Period.

16. "Company" is defined as IBERIABANK Corporation.

17. "Loss" is defined to include, among other things, "damages, judgements, any award of pre-judgment and post-judgment interest, settlements and Defense Costs."

18. "Defense Costs" is defined to include, among other things, "reasonable costs, charges, fees (including but not limited to attorneys' fees and experts' fees) and expenses … incurred by the Insureds in defending or investigating Claims[.]"

19. "Claim" is defined to include, among other things, "a written demand for monetary damages" and "a formal administrative or regulatory adjudicatory or investigative proceeding . . . ."

20. "Wrongful Acts" is defined to include, among other things, "any error, misstatement, misleading statement, act, omission, neglect or breach of duty actually or allegedly committed or attempted … by the Company."

21. "Professional Services" is defined to include "services performed by or on behalf of the Company for a policyholder or third party client of the Company. The Professional Services must be performed pursuant to a written contract with such policyholder or client for consideration inuring to the benefit of the Company."

22. The Excess Policy adopts all relevant insuring clauses, warranties, definitions, terms, conditions, exclusions, and other provisions contained in the Primary Policy, and provides $5,000,000 in excess of the $10,000,000 in coverage provided by the Primary Policy. A true and correct copy of the Excess Policy is attached as Exhibit B.

**B.     The HUD Investigation and Settlement Demand**

23. The FHA Insurance Program encourages lenders to lend to residential-mortgage borrowers who can make only small down payments by providing lenders with insurance against default when borrowers meet certain underwriting criteria.

24. Under the DE Lender Program, private banks and mortgage companies agree pursuant to contract to perform the necessary diligence to decide, based on HUD's guidelines and specifications, whether a borrower represents an acceptable risk for HUD and, if so, to underwrite a mortgage loan to that borrower without prior HUD approval.

25. HUD permits these private banks and mortgage companies to collect customary fees and charges from the borrower for origination services.

26. IBERIABANK participated in the DE Lender Program.

27. By underwriting and originating mortgages as a DE Lender, IBERIABANK provided professional service to its client, HUD.

28. As a DE Lender, IBERIABANK also provided professional services to borrowers, for whom it underwrote and originated mortgage loans, under a contract and for a fee.

29. As a DE Lender, IBERIABANK certified that the loans it submitted for FHA insurance complied with certain HUD requirements related to quality control, underwriting, and self-reporting.

30. Over the past several years, the DOJ has asserted that many of the financial institutions that participated in the DE Lender Program violated the FCA by submitting certifications for FHA-insured loans that were inaccurate because various loans, in the DOJ's estimation, did not comply with HUD underwriting guidelines. The DOJ has entered into multi-million dollars settlements with many of the largest lenders that historically participated in the DE Lender Program based on these allegations.

31. On July 1, 2016 and during the Policy Period, a subpoena was served on IBERIABANK for IBERIABANK Mortgage Company ("IMC") by HUD's Inspector General. The HUD subpoena sought the production of documents, including among other things, documents related to: certain mortgage loans issued by IMC; IMC's rules, policies, procedures, guidelines or practices regarding mortgages to be insured by the FHA; and IMC's participation in HUD's DE Lender Program.

32. On September 22, 2016, IBERIABANK provided notice of HUD's investigation to the Insurers. The Insurers accepted the notice as a notice of circumstances that may give rise to a Claim under the terms of the Policies.

33. On April 18, 2017, DOJ representatives met with representatives of IBERIABANK and informed IBERIABANK of its potential liabilities under the FCA. At that meeting, the DOJ asserted that IBERIABANK could be liable, *inter alia*, for its alleged loan underwriting errors and omissions under the FCA even in the absence of any proof of specific intent to defraud.

34. On August 8, 2017 the DOJ demanded that IBERIABANK pay $17,263,982 to settle the government's claims against it (including FCA and common law claims) in connection with IBERIABANK's participation in HUD's DE Lender Program.

35. IBERIABANK vigorously disputed the DOJ's allegations and incurred substantial costs investigating and defending against the DOJ's allegations. Following extensive negotiations with the DOJ, on or about September 21, 2017, IBERIABANK proposed to settle the government's claims related to IBERIABANK's participate in the DE Lender Program for $11,692,149.00 (the "HUD Settlement"). The DOJ accepted IBERIABANK's proposed settlement amount and, after finalizing the settlement terms and conditions, IBERIABANK paid $11,692,149.00 to the DOJ on or about December 12, 2017.

**C.     Insurance Coverage for Loss related to the HUD Settlement**

36. IBERIABANK has complied with and satisfied all conditions precedent for coverage under the Primary and Excess Policies with respect its losses associated with the HUD Settlement.

37. The HUD Settlement constitutes a Claim for Wrongful Acts under the Primary and Excess Policies.

38. IBERIABANK's losses resulting from its costs and expenses in investigating and defending against the DOJ's allegations that resulted in the HUD Settlement (the "Defense

Expenses") constitute "Defense Costs" and is a covered Loss under the Primary and Excess Policies.

39. IBERIABANK's losses resulting from its Defense Expenses and the HUD Settlement constitute covered Loss under the Primary and Excess Policies.

40. IBERIABANK's Defense Expenses and the HUD Settlement constitute covered Losses to IBERIABANK. Those losses exceed the $10,000,000 limit of the Primary Policy and implicate coverage under the Excess Policy.

41. No exclusion in either the Primary Policy or Excess Policy limits or precludes coverage for either the Defense Expenses or the HUD Settlement.

42. Despite IBERIABANK's entitlement to coverage under the Primary and Excess Policies, the Insurers have disclaimed and/or failed to acknowledge coverage for IBERIABANK's Defense Expenses or the HUD Settlement.

**D.      Summary of Coverage Correspondence with the Insurers**

43. In addition to notifying the Insurers of HUD's investigation in September 2016, IBERIABANK and the Insurers exchanged communications regarding the investigation in June, July, August and October 2017. Among other things, these communications included updates from IBERIABANK to the Insurers regarding the status of HUD's investigation and the DOJ's August 2017 settlement demand.

44. In its communications, IBERIABANK identified the basis for coverage under the Primary and Excess Policies for any Losses incurred in connection with a settlement of the DOJ's allegations. Following the DOJ's settlement demand, IBERIABANK sought the Insurers' consent to settle the DOJ's disputed allegations.

45. In correspondence dated July 17 and October 12, 2017, Illinois Union outlined the bases upon which it believed insurance coverage for any Loss incurred in connection with any settlement of the DOJ's allegations was, or may be, unavailable under the Primary Policy.

46. On September 8, 2017, IBERIABANK requested that Illinois Union and Travelers consent to a settlement of the DOJ's allegations up to $11.6 million (inclusive of the $500,000 self-insured retention) or alternatively, agree not to raise lack of consent as a defense to coverage.

47. On September 11, 2017, Illinois Union informed IBERIABANK, that it agreed not to raise lack of consent as a separate coverage defense. On September 12, 2017 Travelers adopted Illinois Union's position, agreeing not to raise lack of consent as a separate coverage defense.

48. Illinois Union unequivocally and repeatedly informed IBERIABANK that a settlement with the DOJ is not covered under the Primary Policy. Travelers adopted Illinois Union's no-coverage position. To date, neither Illinois Union nor Travelers has paid IBERIABANK any amounts for its Defense Expenses or for the HUD Settlement, in breach of the terms of the Policies.

**COUNT I**
**BREACH OF CONTRACT**
**(WITH RESPECT TO ILLINOIS UNION)**

49. IBERIABANK incorporates by reference, as if fully set forth herein, the facts set forth in paragraphs 1-48 above.

50. The Primary Policy is an insurance contract for which IBERIABANK paid premiums in exchange for insurance coverage, including coverage for Losses arising from the HUD Settlement and the Defense Expenses.

51. IBERIABANK's Losses incurred in connection with the HUD Settlement exceed IBERIABANK's $500,000 self-insured retention.

52. IBERIABANK's Losses incurred in connection with the HUD Settlement implicate coverage under the Primary Policy.

53. Illinois Union is required by the terms of the Primary Policy to pay IBERIABANK's Losses in connection with the HUD Settlement.

54. By informing IBERIABANK that it will not cover IBERIABANK's Losses in connection with the HUD Settlement, Illinois Union has announced that it will not perform its obligations under the Primary Policy. Illinois Union's wrongful repudiation of its coverage obligations is a breach of the Primary Policy.

55. As a result of Illinois Union's repudiation of its obligations and breach of the Primary Policy, IBERIABANK has sustained and will continue to sustain damages for which Illinois Union is liable to IBERIABANK, up to the Primary Policy's $10 million limit.

## COUNT II
## BREACH OF CONTRACT
## (WITH RESPECT TO TRAVELERS)

56. IBERIABANK incorporates by reference, as if fully set forth herein, the facts set forth in paragraphs 1-55, above.

57. The Excess Policy is an insurance contract for which IBERIABANK paid premiums in exchange for insurance coverage, including coverage for Losses arising from the HUD Settlement and the Defense Expenses.

58. IBERIABANK's Losses incurred in connection with the HUD Settlement exceed IBERIABANK's $500,000 self-insured retention and the $10,000,000 limits of the Primary Policy.

59. IBERIABANK's Losses incurred in connection with the HUD Settlement implicate coverage under the Excess Policy.

60. Travelers is required by the terms of the Excess Policy to pay IBERIABANK's Losses in connection with the HUD Settlement.

61. By failing and refusing to pay any amounts to IBERIABANK under the terms of the Excess Policy for IBERIABANK's Losses in connection with the HUD Settlement, Travelers has breached the terms of the Excess Policy.

62. IBERIABANK has suffered damages, in an amount to be determined at trial, due to Travelers' breach of the terms of the Excess Policy.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays that the Court:

1. enter judgment on Count I in favor of IBERIABANK and against Illinois Union;

2. award compensatory damages to IBERIABANK and against Illinois Union on Count I for the full policy limits of $10 million to compensate IBERIABANK for the Loss it sustained as a result of Illinois Union's breach of the Primary Policy and refusal to pay up to the limits of the Primary Policy for the HUD Settlement;

3. enter judgment on Count II in favor of IBERIABANK and against Travelers;

4. award compensatory damages to IBERIABANK and against Travelers on Count II for IBERIABANK's Losses, in excess of $10,500,000, that IBERIABANK incurred in connection with the HUD Settlement, in an exact amount to be proven at trial; and

5. award such additional and further relief as the Court deems appropriate, including

but not limited to interest, both pre and post judgment.

## JURY DEMAND

IBERIABANK hereby demands a jury on its breach of contract claims and all other issues triable to a jury.

Dated: February 2, 2018

                                              Respectfully Submitted,

                                              /s/ *Loretta G. Mince*
                                              James R. Swanson, Esq.
                                              Loretta G. Mince, Esq.
                                              Fishman Haygood
                                              201 St. Charles Avenue
                                              Suite 4600
                                              New Orleans, LA 70170-4600
                                              (504) 586-5267

                                              Traci S. Rea, Esq. (pro hac pending)
                                              Reed Smith LLP
                                              225 Fifth Avenue, Suite 1200
                                              Pittsburgh, PA 15222
                                              (412) 288-4184

1291359v.1