UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IBERIABANK CORPORATION | CIVIL ACTION |
| VERSUS | NO. 18-1090 |
| ILLINOIS UNION INSURANCE COMPANY and TRAVELERS CASUALTY AND SURETY COMPANY OF AMERICA | SECTION M (4) |

## ORDER & REASONS

Before the Court are: (1) a motion to dismiss filed by defendant Illinois Union Insurance Company ("Chubb"),[1] to which plaintiff Iberiabank Corporation ("Iberiabank") responds in opposition,[2] and in further support of which Chubb replies;[3] and (2) a motion to dismiss filed by defendant Travelers Casualty and Surety Company of America ("Travelers"),[4] to which Iberiabank responds in opposition,[5] in further support of which Travelers replies,[6] and in further opposition to which Iberiabank files a surreply.[7] Having considered the parties' memoranda and the applicable law, the Court issues this Order & Reasons.

**I. BACKGROUND**

This case involves a dispute regarding coverage under bankers' professional liability insurance policies. For the policy period of September 30, 2015 to September 30, 2016, Iberiabank purchased primary and excess bankers' professional liability insurance from Chubb and Travelers, respectively.[8] Chubb issued the primary policy with a limit of $10,000,000 above

---

[1] R. Doc. 24.
[2] R. Doc. 38.
[3] R. Doc. 45.
[4] R. Doc. 26.
[5] R. Doc. 37.
[6] R. Doc. 43.
[7] R. Doc. 51.
[8] R. Doc. 1 at 4.

Iberiabank's $500,000 self-insured retention.[9] Travelers issued the excess policy that adopts all relevant terms and conditions of Chubb's primary policy, and provides $5,000,000 in excess of the $10,000,000 in coverage provided by the primary policy.[10]

The Federal Housing Administration ("FHA"), an agency within the Department of Housing and Urban Development ("HUD"), insures approved lenders against losses on mortgage loans made to buyers of single-family homes.[11] The Direct Endorsement program ("DE program") is one such mortgage insurance program operated by the FHA.[12] Under the DE program, HUD relies on approved mortgage lenders to apply HUD's requirements in determining whether a borrower represents an acceptable credit risk for HUD to certify loans for FHA mortgage insurance without prior review or approval by HUD.[13] Iberiabank has participated in the DE program since 1984.[14]

On July 8, 2015, a former Iberiabank employee and a then-current Iberiabank employee (collectively "Relators") brought a whistleblower *qui tam* action on behalf of the United States government against Iberiabank alleging violations of the False Claims Act ("FCA"), 31 U.S.C. §§ 3729, *et seq.*, arising from Iberiabank's participation in the DE program.[15] In the Iberiabank *qui tam* action, the Relators alleged that Iberiabank submitted false and fraudulent claims and records to HUD regarding mortgage loans Iberiabank made to its borrower clients to secure mortgage insurance from the FHA under the DE program.[16] Specifically, the Relators alleged that Iberiabank violated the FCA by: (1) falsely certifying to the FHA that loans submitted to be insured complied with HUD regulations and therefore were eligible for FHA insurance; (2)

---

[9] *Id.*
[10] *Id.* at 5.
[11] R. Doc. 24-2 at 6. This document is the complaint from *United States ex rel. Shackelford, et al. v. Iberiabank, et al.*, C/A No. 4:15-cv-416-BRW (E.D. Ark.) ("the Iberiabank *qui tam* action").
[12] *Id.*
[13] *Id.*
[14] *Id.* at 12.
[15] *Id.* at 2-23.
[16] *Id.* at 12-14.

making false and fraudulent claims for approval in connection with its acquisition of FHA insurance for mortgages and fraudulently causing the government to pay insurance claims on these mortgages; (3) paying mortgage underwriters commissions in violation of HUD regulations; and (4) refusing to self-report known defective and fraudulent loans.[17]

On July 1, 2016, HUD's Inspector General served a subpoena on Iberiabank seeking production of documents related to: certain mortgage loans issued by Iberiabank; Iberiabank's rules, policies, procedures, guidelines, or practices regarding mortgages to be insured by the FHA; and Iberiabank's participation in the DE program.[18] On September 22, 2016, Iberiabank informed Chubb and Travelers of the subpoena and HUD's investigation.[19]

On April 18, 2017, representatives of the Department of Justice ("DOJ") met with Iberiabank representatives and informed them of Iberiabank's potential liability under the FCA for what Iberiabank now says was "its alleged loan underwriting errors and omissions."[20] On August 8, 2017, the DOJ made a settlement demand to Iberiabank asking it to pay $17,263,982 to settle the government's claims against it in connection with its participation in the DE program.[21] On September 21, 2017, Iberiabank offered to settle with the government for $11,692,149; the government accepted the offer, and the Relators consented.[22] The settlement was finalized on December 12, 2017.[23]

Iberiabank made a claim on the Chubb and Travelers bankers' professional liability insurance policies for the DOJ investigation and settlement.[24] Chubb and Travelers both denied the claim.[25] As a result, Iberiabank filed this suit against Chubb and Travelers alleging that they

---

[17] *Id.*
[18] R. Doc. 1 at 6.
[19] *Id.*
[20] *Id.* at 7.
[21] *Id.*
[22] *Id.* & R. Doc. 24-5.
[23] R. Doc. 1 at 7 & R. Doc. 24-5.
[24] R. Doc. 1 at 8.
[25] *Id.* at 8-9.

3

breached the insurance contracts by failing to pay the claim.[26]

Chubb and Travelers filed the instant motions to dismiss arguing that Iberiabank cannot state breach-of-contract claims against them because the DOJ settlement is not a loss covered by the policies.[27] Travelers also argues that Iberiabank cannot state a claim against it as an excess insurer because the primary insurer has not yet paid the limits of its policy.[28] Iberiabank opposes the motions arguing that it has stated enough facts in its complaint to establish that the DOJ settlement is covered and to state claims for breach of contract against Chubb and Travelers.[29]

## III. LAW & ANALYSIS

### A. Rule 12(b)(6) of the Federal Rules of Civil Procedure

The Federal Rules of Civil Procedure require a complaint to contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Rule 8 "does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). The statement of the claim must "'give the defendant fair notice of what the ... claim is and the grounds upon which it rests.'" *Twombly*, 550 U.S. at 555 (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). A pleading does not comply with Rule 8 if it offers "labels and conclusions," "a formulaic recitation of the elements of a cause of action," or "'naked assertion[s]' devoid of 'further factual enhancement.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555-57).

Rule 12(b)(6) of the Federal Rules of Civil Procedure permits a party to move to dismiss for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true,

---

[26] *Id.* at 9-11.
[27] R. Docs. 24 & 26.
[28] R. Doc. 26 at 7-10.
[29] R. Docs. 37, 38 & 51.

4

to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). A claim is plausible on the face of the complaint "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Twombly*, 550 U.S. at 556). Plausibility does not equate to probability, but rather "it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (citing *Twombly*, 550 U.S. at 556). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of "entitlement to relief."'" *Id.* (quoting *Twombly*, 550 U.S. at 557). Thus, if the facts pleaded in the complaint "do not permit the court to infer more than a mere possibility of misconduct, the complaint has alleged – but it has not 'show[n]' – 'that the pleader is entitled to relief.'" *Id.* at 679 (quoting Fed. R. Civ. P. 8(a)(2)). Motions to dismiss are disfavored and rarely granted. *Turner v. Pleasant*, 663 F.3d 770, 775 (5th Cir. 2011) (citing *Harrington v. State Farm Fire & Cas. Co.*, 563 F.3d 141, 147 (5th Cir. 2009)).

In considering a Rule 12(b)(6) motion to dismiss for failure to state a claim, a court employs the two-pronged approach utilized in *Twombly*. The court "can choose to begin by identifying pleadings that, because they are no more than conclusions [unsupported by factual allegations], are not entitled to the assumption of truth." *Id.* However, "[w]hen there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.*

A court's review of a Rule 12(b)(6) motion to dismiss "is limited to the complaint, any documents attached to the complaint, and any documents attached to the motion to dismiss that are central to the claim and referenced by the complaint." *Lone Star Fund V. (U.S.), L.P. v. Barclays Bank PLC*, 594 F.3d 383, 387 (5th Cir. 2010) (citing *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498-99 (5th Cir. 2000)). A court may also take judicial notice of certain matters, including public records and government websites. *Dorsey v. Portfolio Equities, Inc.*,

540 F.3d 333, 338 (5th Cir. 2007); *see also Hawk Aircargo, Inc. v. Chai.*, 418 F.3d 453, 457 (5th Cir. 2005). Thus, in weighing a Rule 12(b)(6) motion, district courts primarily look to the allegations found in the complaint, but courts may also consider "documents incorporated into the complaint by reference or integral to the claim, items subject to judicial notice, matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint whose authenticity is unquestioned." *Meyers v. Textron, Inc.*, 540 F. App'x 408, 409 (5th Cir. 2013) (citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007)).

### B. Insurance Policy Interpretation under Louisiana Law[30]

Under Louisiana law, an insurance policy, like any other contract, is construed according to the general rules of contract interpretation set forth in the Louisiana Civil Code. *Cadwallader v. Allstate Ins. Co.*, 848 So. 2d 577, 580 (La. 2003) (citations omitted). Contracts are interpreted to determine "the common intent of the parties." *Id.* (citations omitted). "Words and phrases used in an insurance policy are to be construed using their plain, ordinary and generally prevailing meaning, unless the words have acquired a technical meaning." *Id.* (citations omitted). An insurance policy "should not be interpreted in an unreasonable or strained manner under the guise of contractual interpretation to enlarge or to restrict its provisions beyond what is reasonably contemplated by unambiguous terms or achieve an absurd conclusion." *Id.* (citations omitted). A court cannot exercise "inventive powers to create an ambiguity where none exists or the making of a new contract when the terms express with sufficient clearness the parties' intent." *Id.* (citations omitted). Thus, clear and unambiguous policy wording that expresses the parties' intent is enforced as written. *Id.*

Ambiguous provisions and "equivocal provisions seeking to narrow an insurer's obligation," on the other hand, are strictly construed against the insurer and in favor of coverage.

---

[30] The parties agree that Louisiana law applies in this diversity action. R. Doc. 24-1 at 12; R. Doc. 38 at 3.

6

*Id.* (citations omitted). However, the strict construction principle applies only if the ambiguous policy provision is susceptible of more than one reasonable interpretation. *Id.* (citations omitted). "[T]he insurer has the burden of proving the applicability of a coverage exclusion." *Hampton v. Lincoln Nat'l Life Ins. Co.*, 445 So. 2d 110, 113 (La. App. 1984). "The determination of whether a contract is clear or ambiguous is a question of law." *Cadwallader*, 848 So. 2d at 580.

### C. Coverage of the Settlement

In determining whether insurance coverage exists here for the settlement of the Iberiabank *qui tam* action, the Court refers to the bankers' professional liability policy (the Chubb policy),[31] the complaint in the *qui tam* action, and all facts known to the insurer. Chubb contends that facts known to it at the time it denied coverage included the settlement agreement between the government and Iberiabank resolving the Iberiabank *qui tam* action as well as the order of dismissal in the Iberiabank *qui tam* action, and Chubb asks the Court to take judicial notice of these documents. Iberiabank does not oppose the request, so the Court will consider these documents as well.

The Chubb bankers' professional liability insurance policy at issue provides coverage as follows:

> The Insurer [Chubb and/or Travelers] shall pay on behalf of the Insureds [Iberiabank] Loss[32] which the Insureds [Iberiabank] become legally obligated to

---

[31] The language of the Chubb policy controls since the Travelers policy is strictly excess and follows the Chubb policy for purposes of coverage. Accordingly, except where otherwise noted, for the balance of this Order & Reasons, references to the professional liability policy at issue here are to the Chubb policy.

[32] "Loss" is defined as:

the amount which the Insureds become legally obligated to pay on account of each Claim and for all Claims in the Policy Period ... made against them for Wrongful Acts for which coverage applies, including, but not limited to, damages, judgments, any award of pre-judgment and post-judgment interest, settlements and Defense Costs. Loss does not include (1) any amount for which the Insureds are absolved from payment, (2) taxes, fines or penalties imposed by law, (3) the multiple portion of any multiplied damage award, (4) punitive or exemplary damages, or (5) matters uninsurable under the law pursuant to which this Policy is construed.

R. Doc. 1-2 at 26.

> pay by reason of any Claim[33] first made by a third party client of the Company [Iberiabank] against the Insureds [Iberiabank] during the Policy Period … for any Wrongful Acts[34] in rendering or failing to render Professional Services, if such Wrongful Acts take place prior to the end of the Policy Period.

The Chubb policy defines the term "Professional Services" to mean:

> services performed by or on behalf of the Company [Iberiabank] for a policyholder or third party client of the Company. The Professional Services must be performed pursuant to a written contract with such policyholder or client for consideration inuring to the benefit of the Company.[35]

Iberiabank argues that its settlement with the DOJ is a covered claim. Specifically, Iberiabank argues that, by participating in the DE program, it provided professional services to HUD in underwriting and originating loans backed by FHA insurance based on HUD's guidelines, such that HUD was Iberiabank's "third party client" for purposes of the professional liability policy.[36] Iberiabank also argues that the policy does not require that the "third party client" who brings a claim against Iberiabank have a written agreement with Iberiabank, pay for its professional services, or be the same entity to whom the professional services were

---

[33] "Claim" is defined as:

1. a written demand for monetary damages,

2. a civil proceeding commenced by the service of a complaint or similar pleading,

3. an arbitration proceeding,

4. a criminal proceeding commenced by a return of an indictment, or

5. a formal administrative or regulatory adjudicatory or investigative proceeding commenced by the filing of a notice of charge, formal investigative order or similar document, against any Insured, including an appeal therefrom.

R. Doc. 1-2 at 26.

[34] "Wrongful Act means any error, misstatement, misleading statement, act, omission, neglect or breach of duty actually or allegedly committed or attempted by the Insured Persons in their capacity as such or by the Company." R. Doc. 1-2 at 26.

[35] R. Doc. 1-2 at 26.
[36] R. Doc. 38 at 5.

provided.[37] Finally, Iberiabank argues that its claim is covered because its participation in the DE program was pursuant to a contract for which it received a benefit.[38]

Chubb and Travelers contend that a plain reading of the policy demonstrates that Iberiabank's claim is not covered. The insurers argue that the government was not a customer or client of Iberiabank for whom Iberiabank performed professional services as defined in the policy.[39] The government did not seek advice from Iberiabank or pay it for services in issuing mortgages.[40] Instead, Iberiabank's clients were the borrowers to whom it issued mortgages, as a part of the underwriting that constituted its professional services, and Iberiabank was a client of the government (not vice versa) from whom Iberiabank obtained the mortgage insurance.[41] The insurers also argue that FCA claims are not covered under a professional liability insurance policy.[42]

1. **The government was not a "client" of Iberiabank**

The Court agrees with the insurers that a plain reading of the unambiguous policy language shows that Iberiabank's claim is not covered. The policy clearly states that it provides coverage for a loss incurred by Iberiabank on a claim made against it by a third-party client of Iberiabank for wrongful acts in performing professional services pursuant to a written contract "with such … client for consideration inuring to the benefit of" Iberiabank.[43] Because the term "client" is not defined in the policy, it is construed according to its plain and ordinary meaning. *Cadwallader*, 848 So. 2d at 580. *Black's Law Dictionary* defines "client" as "[a] person or entity that employs a professional for advice or help in that professional's line or work." *Client*, BLACK'S LAW DICTIONARY (10th ed. 2014). When the definition of "client" is considered in

---
[37] *Id.* at 11-14.
[38] *Id.* at 15-16.
[39] R. Doc. 24-1 at 17-19.
[40] *Id.*
[41] *Id.*
[42] *Id.* at 12-16.
[43] R. Doc. 1-2 at 26.

9

light of the terms of the policy, it is clear that the policy covers "wrongful acts" performed in rendering "professional services" to a "client" and that the wronged "client" must be the one to make the claim. *See D'Amato v. Endurance Am. Specialty Ins. Co.*, 2012 WL 12872722, at *9 (S.D. Tex. Oct. 5, 2012) (interpreting similar policy language and stating that the "receipt of professional services thus appears to be the central characteristic defining what it means to be a client").

In the Iberiabank *qui tam* action, Iberiabank was accused of committing wrongful acts against HUD by submitting false and fraudulent information to the agency in connection with the bank's participation in the DE program. The structure of the transactions shows that HUD was not Iberiabank's client. Iberiabank, as a mortgage lender, was engaged by mortgage borrowers to make loans. The mortgage borrowers were the people who employed, and paid fees to, Iberiabank to underwrite the loans – one of its principal services. Thus, the borrowers were Iberiabank's clients. Iberiabank in turn submitted information to HUD to obtain mortgage insurance on those loans through the FHA, thereby providing a service to its borrowers, not HUD. Although Iberiabank was participating in a HUD-endorsed program, HUD was not the client paying Iberiabank for its professional services within the meaning of the policy. Further, Iberiabank was not accused of committing wrongful acts in the issuance of the professional services to the borrower, but rather in submitting information to HUD. Thus, Iberiabank's clients, its borrowers, did not make the False Claims Act claims that were settled and for which Iberiabank now seeks coverage.

### 2. Iberiabank did not provide "professional services" to the government

Every federal circuit faced with the issue has held that coverage under a professional liability insurance policy is not triggered by claims asserted under the False Claims Act because such claims are not predicated on the insured's professional services that are covered by such a policy. *See Health Care Indus. Liab. Ins. Program v. Momence Meadows Nursing Ctr., Inc.*, 566

F.3d 689, 695 (7th Cir. 2009); *Zurich Am. Ins. Co. v. O'Hara Reg'l Ctr. for Rehab.,* 529 F.3d 916, 921-23 (10th Cir. 2008); *Horizon W., Inc. v. St. Paul Fire & Marine Ins. Co.*, 45 F. App'x 752, 753-54 (9th Cir. 2002); *Jenkins v. St. Paul Fire & Marine Ins. Co.*, 8 F. App'x 573, 574 (8th Cir. 2001); *see also M/G Transport Servs., Inc. v. Water Quality Ins. Syndicate*, 243 F.3d 974, 978 (6th Cir. 2000) (False Claims Act action not covered under pollution policy despite underlying Clean Water Act violations).

Central to each of these cases is the understanding that "[t]he FCA imposes liability on persons or corporations who knowingly submit false claims to the government" in return for a government-provided benefit – whether reimbursement or something else.[44] *Jenkins*, 8 F. App'x at 574. In *Jenkins*, a 2001 decision, the *qui tam* action there asserted that a doctor had made false claims to the Healthcare Finance Administration for reimbursement, and the Eighth Circuit concluded that "any award in that action would not have resulted from the 'providing or withholding of professional services'" within the meaning of the professional liability policy. *Id.* While the doctor's policy was not a bankers' professional liability policy, the insuring clause of the professional liability policy at issue paralleled the "rendering or failing to render Professional Services" language in the insuring clause of Chubb's policy. That the professional liability policy was labeled a medical policy rather than a bankers' policy only meant that the underlying services, as distinct from the actionable conduct, involved medical care as opposed to banking services like underwriting.

The key distinction in this line of cases became clearer in the Ninth Circuit's 2002 decision in *Horizon West, Inc. v. St. Paul Fire & Marine Ins. Co.*, 45 F. App'x at 752-54, a case involving an FCA *qui tam* action against a group of nursing home operators (Horizon West) for

---

[44] Here, the "something else" was mortgage insurance, and the payment of commissions. The *qui tam* action charged Iberiabank with submitting (1) false certifications concerning FHA-insured mortgage loans to procure mortgage insurance from the government to facilitate the lending and to protect Iberiabank from loan defaults; (2) false claims on ineligible loans to obtain FHA insurance for mortgages and to trigger insurance payments from the government; and (3) requests to pay commissions in violation of HUD regulations. R. Doc. 24-2 at 12-14.

11

false Medicare and Medicaid claims in which the quality of care at the facilities was misrepresented in order to maintain eligibility for payment under Medicare and Medicaid. Horizon West sought insurance coverage for the FCA claim under a professional liability policy with an insuring clause containing the "providing or failure to provide professional services" qualifier. The Ninth Circuit rejected Horizon West's argument that the FCA *qui tam* suit involved a covered claim for overpayment of the Medicare and Medicaid claims resulting from Horizon West's alleged failure to provide the professional care services for which it billed the government, reasoning:

> Reading the FCA complaint and the liability policy together, we find this argument unavailing. ***The FCA injury does not "result from" Horizon West's failure to provide professional services, but from its submission of allegedly fraudulent bills and its alleged misrepresentation of care standards.*** If Horizon West had never submitted allegedly false bills or made allegedly false certifications to maintain eligibility for Medicare and Medicaid payment, there would be no basis for an FCA claim. The "providing or failure to provide professional services" is merely conduct underlying the FCA claim. While in a technical sense the bills and certifications would not have been false if Horizon West had actually provided the billed for services or had met requisite eligibility standards, ***we believe the injury alleged in the FCA action "results from" the creation or presentation of false claims, not the fraudulent conduct underlying them.***

*Id.* at 753-54 (emphasis added) (citing 31 U.S.C. § 3729(a); *M/G Transport Servs.*, 234 F.3d at 978; *U.S. ex rel. Hopper v. Anton*, 91 F.3d 1261, 1266 (9th Cir. 1996)). As the Ninth Circuit emphasized, the distinction between the false claims that are the subject of the FCA action (certifications regarding nursing care) and the professional services (nursing care) underlying the false claims is determinative of the coverage question.

In a similar case involving false billing claims made to the government with regard to long-term nursing care services, the Tenth Circuit in 2008 likewise held that the false claims were not covered under a professional liability insurance policy. *Zurich Am. Ins. Co. v. O'Hara*

*Reg'l Ctr. for Rehab.*, 529 F.3d at 921-23. The insured (O'Hara) argued that the FCA case arose out of its failure to provide adequate professional nursing services, but the court disagreed:

> The government's injury was not caused by O'Hara's failure to provide professional services, but instead resulted from O'Hara's submission of false and fraudulent claims for reimbursement. Specifically, ***the crux of the government's claim is that O'Hara promised to provide a certain level of patient care; it represented to the government it provided the contractually agreed levels of care; but, in fact, it did not provide the agreed services.*** As we read the government's cause of action, the problem was not the actual level of services provided to O'Hara's patients, but rather that O'Hara billed for services it did not provide – namely, enhanced services. This violates the provider agreements.

*Id*. at 921-22 (emphasis added).

The Tenth Circuit's reasoning applies with equal force in this case. The crux of the FCA claims in the *qui tam* action against Iberiabank is that the bank promised to provide a certain level of underwriting in connection with its participation in the DE program; and the bank certified to the government that it provided the agreed level of underwriting when it had not, resulting in the issuance of FHA insurance on ineligible loans, the payment of insurance claims on ineligible loans, and the payment of mortgage commissions in violation of HUD regulations. Thus, while Iberiabank urges coverage by focusing only on its underwriting as the "professional services" triggering coverage under the Chubb policy, the bank ignores its conduct that lay at the heart of the FCA claim and that falls outside the ambit of insurance coverage – namely, Iberiabank's false certifications to the government that it had provided the agreed level of underwriting in connection with obtaining the FHA insurance.

Other courts have followed this line of cases in rejecting claims for professional liability insurance coverage of FCA *qui tam* actions. In *Health Care Industry Liability Insurance Program v. Momence Meadows Nursing Center, Inc.*, a 2009 decision, the Seventh Circuit observed that "[t]he statutory damages [the FCA relators] seek result from [the nursing home operator's] allegedly false filings, and *not* from any alleged bodily injury to the residents,"

13

concluding that the FCA relators need only prove the operator's false claims, not shoddy care causing injury. 566 F.3d at 694-95 (emphasis in original). The court observed:

> Other courts have recognized this distinction between the proof required for the FCA claim and the conduct underlying the false claims. They uniformly hold that an insurer is not obligated to defend a qui tam suit merely because the insurer would have to defend the insured against a suit for damages resulting from the insured's conduct underlying the qui tam action.

*Id.* at 695 (footnote collecting cases omitted). More recent cases have followed suit. *See, e.g., Affinity Living Grp., LLC v. Starstone Specialty Ins. Co.*, 2018 WL 4854650 (M.D.N.C. Oct. 5, 2018) (characterizing the false claims to the government as an "intervening cause" severing any connection they might have had with the underlying "medical incident" that would have been covered under the professional liability policy).

Persuaded by the uniform holdings of the circuit courts to have addressed the issue, this Court concludes that the Chubb policy does not extend coverage to the settlement of the FCA *qui tam* suit against Iberiabank. While Iberiabank's underwriting services provided to its borrowers might well fall within the "professional services" contemplated by the Chubb policy, the false certifications the bank made to the government – the crux of the FCA *qui tam* action – do not.

Moreover, the cases cited by Iberiabank are distinguishable.[45] Two of the cases did not involve an FCA claim and so stand for the unremarkable (and irrelevant) proposition that a financial institution's core lines of business, including loan underwriting, qualify as "professional services" under a bankers' professional liability insurance policy. *See PMI Mortg. Ins. Co. v. Am. Int'l Specialty Lines Ins. Co.*, 394 F.3d 761 (9th Cir. 2005); *Franklin Loan Corp. v. Certain Underwriters at Lloyd's, London*, 2011 WL 13224854 (C.D. Cal. Apr. 5, 2011). Other cases cited by Iberiabank, though involving FCA claims, did not involve professional liability policies. *See, e.g., Gallup, Inc. v. Greenwich Ins. Co.*, 2015 WL 1201518 (Del. Super. Ct. Feb. 25, 2015). And the only case involving an FCA claim on a bankers' professional

---

[45] R. Doc. 38 at 7-8.

liability policy cited by Iberiabank, *First Horizon National Corp. v. Houston Casualty Co.*, 2016 WL 1749802 (W.D. Tenn. Apr. 21, 2016), does not stand for the proposition for which it is offered. The facts of *First Horizon* are substantially similar to those of the case at bar – a mortgage lender sought coverage on its bankers' professional liability insurance policy for a claim arising from a settlement with the DOJ regarding its participation in the DE program. *Id.* at *1-2. The court stated that "[i]t appears to be undisputed that the DOJ/HUD settlement is the type of loss covered by the insurance policies at issue." *Id.* at *5. On a superficial level, one can see how this language might provide Iberiabank some comfort. However, the sentence amounts to unsupported dicta. The court performed no analysis of the policy language; it did not examine, much less distinguish, the circuit court authorities reviewed above; and the case turned on timing issues, not the language of the policy.[46] *Id.* Thus, *First Horizon* cannot be cited for the proposition that a banker's professional liability insurance policy covers the claims at issue in this suit. Rather, because the unambiguous policy language demonstrates that Iberiabank cannot sustain breach-of-contract claims against Chubb and Travelers, its claims must be dismissed.

## IV. CONCLUSION

Accordingly,

IT IS ORDERED that Chubb's motion to dismiss is GRANTED (R. Doc. 24), and Iberiabank's claims against it are DISMISSED with prejudice.

IT IS ORDERED that Traveler's motion to dismiss (R. Doc. 26) is GRANTED, and Iberiabank's claims against it are DISMISSED with prejudice.

---

[46] The court ultimately dismissed the coverage claims on summary judgment, holding that all but one of the FCA claims occurred prior to the policy period and that the one claim that was arguably within the policy period was not properly reported to the insurers under the policy. *First Horizon Nat'l Corp. v. Hous. Cas. Co.*, 2017 WL 2954716 (W.D. Tenn. June 23, 2017). The court did not analyze the policy language in this 2017 decision just as it had not in its 2016 decision. Consequently, the *First Horizon v. Houston Casualty* decisions are unavailing to Iberiabank.

New Orleans, Louisiana, this 13th day of February, 2019.

_____
BARRY W. ASHE
UNITED STATES DISTRICT JUDGE